George Tilzer, J.
The defendant was convicted of bookmaking in violation of section 986 of the Penal Law. He was sentenced to pay a fine of $100, or, in lieu thereof, to serve five days’ imprisonment, and, in addition, to serve five days in prison. He was tried by one Judge of the Criminal Court of the City of New York, and sentenced by another Judge.
The defendant was specifically charged with accepting two bets from two unknown people for the total sum of $10". He took the stand in his own behalf and testified that he was 66 years of age, the father of 10 children and had never previously been arrested or convicted of crime. He testified that he was steadily employed as a sewing-machine operator and that at the time and place testified to by the police officer, he was in conversation with other people. He denied accepting bets and ultimately testified that at the time of his arrest the police officer requested that he give him $50 as an alternative to the defendant having to pay a lawyer and bondsman and suffer the consequence of an arrest.
Defendant called a fellow worker who testified that he was present at the time of the alleged incident and that he did not hear or observe any bets taken by the defendant. He further testified that he had known the defendant for 10 years and had never .seen him accept a bet from anybody.
*249 The defendant’s foreman testified that he had known defendant for a period of 3 or 4 years; that he had not seen defendant taking bets on the day in question and that the defendant’s reputation in the shop was that of a good, honest and decent worker.
Several questions are raised on appeal which we regard to be without merit. We have affirmed the conviction of the defendant, yielding to time-honored law which requires an appellate court to leave all questions of fact to be decided by the Trial Judge. The rule is well settled that on review of a conviction in a criminal case, the question of reasonable doubt must be left to the trial court, and the verdict, or decision ,of guilt, will not be disturbed. Where, at the conclusion of a trial, a question of fact remains involving an appraisal by a jury of the credibility of witnesses, it has long been deemed to be incapable of satisfactory solution by a study of the printed record on appeal. The advantages which the jury enjoys, after seeing and hearing the witnesses, their appearance, their demeanor, facial expression, and manner of testifying, is said to give the trial court a greater advantage to determine the quantity and quality of the evidence, and in the absence of any statutory grounds, the determination by the court on a question of fact will be conclusive. An appellate court may not substitute its judgment on the facts for the judgment of the trial court or jury (People v. Tendetnick, 237 App. Div. 9, 11, 12; People v. Lytton, 257 N. Y. 310; People v. Becker, 215 N. Y. 126,159; People v. Arata, 255 N. Y. 374, 375).
This court, by this opinion, has modified the sentence originally imposed by reducing it to the time already served [two days]. This decision is by a divided court, one of the Justices dissenting from the modification of the sentence and voting to affirm in all particulars. In dissenting, the minority has seen fit to express his views on the question of punishment and to give his reasons for voting to affirm this sentence. The matter of sentences or punishment and their modification has been a matter of grave concern to this court and it was deemed necessary, in the circumstances, that the views of the majority be expressed. We were particularly concerned that the language of the minority opinion might be interpreted by some as establishing the policy of this court in the matter of sentences. Where warranted, of course, we would have not the slightest hesitancy in revising a sentence, as we would be quick to overrule a judgment of the Small Claims Court which rested wholly on hearsay. (See Levins v. Bucholtz, 208 Misc. 597, affd. 2 A D 2d 351.)
*250 The barbarities and cruelties of an early day, when society took over the function of revenge on those individuals who broke its laws, in time gave way to the belief that punishment should be imposed as a deterrent. As Judge Cardozo said in his essay on Law and Literature (Selected Writings of Benjamin Nathan Cardozo, Fall on Publications, 1947, Address before the New York Academy of Medicine, November 1, 1928, p. 379): “ Punishment is necessary, indeed, not only to deter the man who is a criminal at heart, who has felt the criminal impulse, who is bn the brink of indecision, but also to deter others who in our existing social organization have never felt the criminal impulse and shrink from crime in horror.”
But the failure of even the most drastic deterrent of all, the death penalty, indicated that punishment was not the answer. As cutting off the hand of a thief had not deterred him from repeating his crime, so incapacitation by imprisonment failed as a deterrent. Far more effective as . a deterrent, from the standpoint of the offender and of society, is rehabilitation. “ Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence.” (Williams v. New York, 337 U. S. 241, 248 [1949].)
But regardless of the form it takes, reformation and rehabilitation to succeed must first of all take into account the offender. As Franklin Delano Roosevelt said in his book ‘ ‘ Looking Forward ” some 30 years ago (New York, John Day, 1933): “ Every scrap of authentic information from those who have been waging war against crime and criminals, night and day, reveals that there is but one way we can reduce crime. That is through a policy of prevention. * * * If the criminal’s past history gives good reason to believe that he is not of the naturally criminal type, that he is capable of real reform and of becoming a useful citizen, there is no doubt that probation, viewed from the selfish standpoint of protection to society alone, is the most efficient method that ive have, and yet it is the least appreciated of all our efforts to rid society of the criminal” (pp. 205, 208; emphasis supplied). (See, too, Wickersham Commission, National Commission on Law and Observance, Reports, No. 9, Report on Penal Institutions, Probation and Parole, Washington, Government Printing Office, 1931, p. 173.)
This individualized treatment of offenders must begin with the sentence.
Owbh J. Roberts, late Associate Justice of the Supreme Court of the United States, welcomed a group of 37 specially selected Justices to an historic conference, called in April, 1953 *251 by the National Probation and Parole Association, in the City of New York. The outcome of this conference was the formation of an Advisory Council of Judges of the National Probation and Parole Association. In 1957 the council published “ Guides for Sentencing”, a work of utmost value to the Judges of the Nation’s courts in meeting the highly controversial problems of sentencing. And in October of this year, the Advisory Council of Judges of the National Council on Crime and Delinquency published its Model Sentencing Act, a statute designed to conform to the best concepts of modern penology. Section 1 of the act, entitled “Liberal Construction” provides as follows: “ This act shall be liberally construed to the end that persons convicted of crime shall be dealt with in accordance with their individual characteristics, circumstances, needs, and potentialities as revealed by case studies; that dangerous offenders shall be correctively treated in custody for long terms as needed; and that other offenders shall be dealt with by probation, suspended sentence, or fine whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the offender or shall be committed for a limited period.” (Emphasis supplied.) The comment on section 9 entitled “ Sentencing for Felonies Generally ”, quotes the following: “More frequent use of suspension of sentence without probation, like the fine, is part of the answer to the prison problem. The national average use of probation is probably about one-third of felony convictions. Many of our informed students of crime tell us that it can safely be two-thirds, and that public security would not be damaged with that percentage of usage” (p. 361). (Bolitha, J. Laws, Chief Judge, United States District Court, Washington, D. C., Laws, Criminal Courts and Adult Probation, 3 NPPA J. 357-358 [1957].)
It must be noted that the individualized treatment of the offender, as the Supreme Court of the United States observed (Williams v. New York, 337 U. S. 211 [1919], supra), has not “ resulted in making the lot of offenders harder. On the contrary a strong motivating force for the changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship. This belief to a large extent has been justified ” (p. 249). Particularly apposite so far as the differences between the majority and minority opinions herein, is the language of the Williams case pointing out (p. 246) that “In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures there are sound practical reasons *252 for the distinction.” But, quite apart from the rules of evidence applicable to trial procedure and the sentencing process, the court went on to say (pp. 247-248) as to the practice of individualizing punishments: “ Undoubtedly the New York statutes emphasize a prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime. People v. Johnson, 252 N. Y. 387, 392, 169 N. E.- 619, 621. The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions — even for offenses today deemed trivial. Today’s philosophy of individualizing sentences makes sharp distinctions for example between first and repeated offenders. Indeterminate sentences the ultimate termination of which are sometimes decided by non-judicial agencies have to a large extent taken the place of the old rigidly fixed punishments. The practice of probation which relies heavily on non-judicial implementation hás been accepted as a wise policy.” Footnote 10 in Williams v. New York {supra) at page 248 states: “ With respect to this policy in the administration of the Probation Act this Court has said: ‘ It is necessary to individualize each case, to give that careful, humane and comprehensive consideration to the particular situation of each offender which would be possible only in the exercise of a broad discretion.’ Burns v. United States, 287 U. S. 216, 220. In Pennsylvania v. Ashe, 302 U. S. 51, 55, this Court further stated: ‘ For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.’ And see Wood and Waite, Crime and Its Treatment, 438-442 (1941).”
It is against the foregoing background that we view the question whether the sentence of the defendant-appellant should be modified. It may be said that to express such care when all there is involved is whether an offender shall serve t'he remainder of his three-day prison term, but a “mild penal sanction” in the opinion of the minority, is to concern ourselves with a trifle. But the guidelines are the same, whether the sentence be five days or life.
Moreover, we cannot agree that five days or three days is a “ mild penal sanction ”. To so hold offends against the very nature of the sentencing procedure which fits the disposition *253 not to the crime, but to the criminal. There are instances in the lives of every human being where five minutes, or five hours, represents an eternity. Liberty is not so cheap that it can be disregarded lightly. If we fail to meet our duties squarely when we are confronted with what we regard to be a harsh sentence, we are not tempering justice with mercy.
In addition, we must observe that we are dealing not with a felony (where it has been recommended that two thirds of all those convicted be put on probation, supra), but with a misdemeanor. That misdemeanor, it must be emphasized, was of the crime of book-making. The court is well aware of the difficulties of enforcing the gambling laws in this city and elsewhere. But one does not eradicate the evil by a rigid system of punishment whereby every first offender is automatically given a prison sentence of five days. The system is as obsolete as its efficacy is wanting. This court has in proper cases affirmed convictions of sentences of five days where the defendant was shown by the evidence to be a professional or persistent gambler or where the facts indicated he was a large operator in this field. However, this court may not by decisional law give recognition to a formula whereby a five-day mandatory sentence is imposed in every book-making conviction regardless of the offender’s needs.
In this connection, in weighing all the factors which led to the imposition of the sentence below, it must be noted that while the Constitution of the United States and the Bill of Rights of this State provide that in all criminal prosecutions the accused shall have the right to a trial by an impartial jury, in the City of New York gambling violations are tried without a jury. In the remainder of the State, nevertheless, gambling violations are tried before a jury. Added to the burden of the gambling defendant, is the fact that he is assigned to trial in the Gambling Part, where nothing but gambling violations are tried. The lot of the Judge assigned to this part is admittedly a difficult one. But if his role is difficult, the task assumed by the sentencing Judge, and the practice has been followed of setting up sentencing parts where convicted gambling defendants are sentenced by Judges other than those who tried such defendants, is most arduous. He must not surrender his sentencing function to any intellectual or emotional biases, to the dictates of any departmental superior or to the demands of public opinion. This separation of the trial from the sentencing function is a practice which can be most prejudicial to defendants and the custom is obviously contrary to modern concepts of penology. The language of the Appellate Division in People v. *254 Georgeadis (270 App. Div. 175,177) is most apt as to the responsibilities of the sentencing Judge: “ The courtroom is a tribunal for the administration of justice and its proceedings should be confined to the prompt and decorous dispatch of the business lawfully before it. In imposing sentence the judge should not seek popularity or publicity by critical and irrelevant dissertations or by employing exceptional severity in meting out punishment. (A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of the court. ’ (Canon 21 of the Canons of Judicial Ethics, adopted by the New York State Bar Association, as amended January 22,1938.)
But regardless of the ‘ ‘ mildness ’ ’■ of the sanction imposed upon the defendant and of the practice followed in the court below, is the authority conferred upon this court to reduce the sentence imposed upon a defendant (Code Crim. Pro., § 54-3). This statute gives every defendant the right of review of the sentence meted out to him and imposes upon the court the responsibility to determine whether the sentence is harsh and excessive and should be modified. Reluctance to face this responsibility or to circumscribe review “by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial ” (Williams v. New York, su'pra, p. 247), means that we have failed in this duty. “ Under the provisions of section 543 of the Code of Criminal Procedure, this court may modify the judgment imposing sentence; and the power to reduce sentence includes the power to find that a sentence or the execution of sentence should be suspended (People v. Zuckerman, 5 N Y 2d 401).” (People v. Silver, 10 A D 2d 274, 275; see, also, People v. Speiser, 277 N. Y. 342; People v. Kolodny, 10 A D 2d 950; People v. Lanza, 10 A D 2d 315; People v. Dendy, 18 A D 2d 667; People v. Sugarman, 16 A D 2d 981; People v. Gondolfo, 16 A D 2d 834; People v. Gerstenfeld, 14 A D 2d 517; People v. King, 38 Misc 2d 665; People v. Stewart, 33 Misc 2d 99.)
The language of the Appellate Division in People v. Silver (supra, p. 276) is pertinent to the instant situation:
“ The prime aim of socialized justice, and inherent in its administration in :our criminal courts today, is a dispassionate and conscientious evaluation of the unique aspects of the convicted offender’s total personality, his intelligence, his character structure, his demonstrated ability to conform, his capacity to accept our social disciplines and limits, and his over-all stability. Such an inventory of his assets and liabilities is indis *255 pensable to a judicial determination in selected cases of whether accidental or situational offenders with promising potential can be aided to readjust to a normal life in the community without the disruptive, and sometimes destructive, effects of imprisonment.
“ In sum, a sentence must not only encompass the community’s condemnation of the defendant’s misconduct, but must also evaluate the possibilities of the rehabilitation of the defendant as a useful and responsible member of the community. The point need not be labored that it is, generally, the community’s gain whenever a family can be kept together as an integrated and emotionally satisfying unit, with the head of the family meeting his responsibilities to it instead of unnecessarily marking time in jail.”
Taking an “ inventory of his [defendant’s] assets and liabilities ’ ’ as well as of the nature of the crime of which he stands convicted, an evaluation omitted by the dissenting opinion, we note that the defendant is 66 years of age, in the eventide ‘of life, that he was never before arrested or convicted of crime, that he raised a family of 10 children, that he was charged with accepting bets in the sum of $10, and that he has already served two days in prison. The circumstances indicate, at very best, that defendant was accepting an accommodation bet. The fact, too, that he did go to prison indicates that defendant is not a professional gambler. Moreover, it must be observed that while the police officer testified that defendant had $24 on his person, the records of the Department of Correction show that defendant had in his possession but $1.20 when he was turned over to the department. With this inventory before us, it being noted that there was no probation report used by the court below, we conclude that a suspended sentence would have been in order.
To add another item to the “ balance sheet ” as to this defendant, the court’s examination of the fingerprint records in similar cases discloses that prior to 1960 the punishment was usually a fine and not a prison sentence. In the year 1960 the Legislature enacted section 998 of the Penal Law which prescribes a mandatory sentence of 10 days upon conviction of a second misdemeanor after September 1, 1960. The defendant, it must be repeated, is a first offender. There would appear to be no policy in the lower court to distinguish between first and second offenders (see Williams v. New York, supra, p. 248), other than to follow a formula of sentencing a first offender to one half of the minimum punishment prescribed for a second offender.
Lastly, we must observe that when all the reports have been read, the ‘ ‘ profit ’ ’ to society is the end result sought to be *256 achieved. Society will not gain in this instance, we believe, by the “ loss ” sought! to be inflicted upon the defendant — a return to jail for 3 days s|ome 14 months after his release; Nor do we have any fears thaJt by our disposition the ‘ ‘ vehicle of the law will be derailed ’ ’. While we cannot assure its safe transit, we would not cut short its journey to nisi prius. We make no claim, nevertheless' that the passage we give to the defendant is the expression of perfect reasoning. The imposition of a sentence is necessarily an imperfect thing. It is not a question of law. It is a matter of heart, conscience and duty.
The judgment of conviction should be modified on the facts and in the exercise of discretion, by reducing the sentence to $100 fine or five days, and two days’ imprisonment, the time already served, and as modified, the judgment should be affirmed.